```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
AMERICAN ATHEISTS, INC., et al.,


                    Plaintiffs,

          v.                              11 Civ. 6026 (DAB)
                                                 OPINION


PORT AUTHORITY OF NY AND NJ, et ano,

                    Defendants.
----------------------------------X
DEBORAH A. BATTS, United States District Judge.
```

Plaintiffs American Atheists, Dennis Horvitz, Kenneth Bronstein, and Jane Everhart ("Plaintiffs") bring this action against the Port Authority of New York and New Jersey ("Port Authority") and the National September 11 Memorial and Museum at the World Trade Center Memorial Foundation, Inc. ("Foundation") (collectively, the "Defendants"), alleging Defendants violated the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the New York constitution, the New Jersey constitution, the New York Civil Rights Act, and New Jersey Statute 10:1-3.  On August 13, 2012, the Port Authority and the Foundation filed separate Motions for Summary Judgment; both were fully submitted on September 24, 2012.  For the reasons that follow, Defendants' Motions are GRANTED.

I.   BACKGROUND

The following facts are undisputed.[1]  The Parties'
familiarity with the facts is assumed, and the facts are laid out
here only as needed for resolution of the Motions currently
before the Court.


A.   The Parties

American Atheists, Inc. is a non-profit corporation that
aims to defend the civil liberties of atheists and strives for
the absolute separation of church and state.  (Am. Compl. ¶ 3.)

_____

[1] Plaintiffs never filed a Local Rule 56.1 Statement.
Instead, in their Opposition, they explain, "[e]xcept as
supplemented or contested below, Plaintiffs concur with the
material statements of material facts set forth in" the Port
Authority's and the Foundations 56.1 Statements.  (Pls.' Opp'n
3.) To satisfy the requirements of Local Rule 56.1, a statement
of undisputed facts opposing summary judgment must respond
specifically, in correspondingly numbered paragraphs, to the
statement of the moving party.  Each statement, including those
controverting any statement of material fact by a movant, must be
followed by citation to admissible evidence.  Accordingly,
Defendants' two 56.1 Statements are deemed admitted.  Giannullo
v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the
opposing party then fails to controvert a fact so set forth in
the moving party's Rule 56.1 statement, that fact will be deemed
admitted."); Buckman v. Calyon Secs., 817 F. Supp. 2d 322, 328
n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by
plaintiff are deemed admitted.").  However, the Court will
consider Plaintiffs' numerous additional factual assertions, few
of which are material, contained within their Opposition and
their Exhibits.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62,
73 (2d Cir. 2001) ("[A] district court has broad discretion to
determine whether to overlook a party's failure to comply with
local court rules.").

It filed this action on behalf of its members.  (Am. Compl. ¶ 3.) Dennis Horvitz, Kenneth Bronstein, and Jane Everhart are citizens and taxpayers of the United States who live in New York City. (Am. Compl. ¶ 4.)

The Port Authority is a bi-state agency between New York and New Jersey.  (Port Authority 56.1 Stmt. ¶ 1.) It owned and operated the World Trade Center until the Center was leased to private parties on July 16, 2001.  (Id. ¶ 4.)

The Foundation is a public charity that was incorporated in 2003 and became active in 2005.  (Foundation 56.1 Stmt. ¶ 1.) The Foundation is responsible for designing, developing, and operating the National September 11 Memorial ("Memorial") and the National September 11 Museum ("Museum").  (Id. ¶ 2.) The Foundation has a minimum of fifteen members on its Board of Directors.  (Alcott Decl., Ex. 1, at 1, Ex. 4, at 1.) Before December 31, 2005, the New York State Governor and the New York City Mayor appointed all its Directors.  (Alcott Decl., Ex. 1, at 1, Ex. 2, at 1.) As of January 2007, the New York State Governor and the New York City Mayor each appoint one member, with the remaining Directors being elected.[2]  (Pls.' Opp'n 6; Alcott Decl., Ex. 3, at 1, Ex. 4, at 1, Ex. 5, at 1.)

---

[2] It is unclear, based on the Exhibits presented to the Court, how the board was selected between January 1, 2005 and January 1, 2007.

B.   Factual Background

After the destruction of the World Trade Center on September 11, 2001, recovery workers found steel beams in the shape of a cross (hereinafter "cross" or "artifact") near 6 World Trade Center on September 13, 2001.  (Port Authority 56.1 Stmt. ¶ 7; Foundation 56.1 Stmt. ¶ 16.) The workers removed the cross, which stands approximately seventeen feet tall, from the debris and erected it at the rescue site.  (Port Authority 56.1 Stmt.¶ 7; Foundation 56.1 Stmt. ¶ 16.) During the rescue and recovery effort, many allegedly regarded the cross as a source of comfort and spirituality.  (Foundation 56.1 Stmt. ¶ 18; Pls.' Opp'n 3-6.) Religious services were conducted in front of the cross, and at various times the artifact was blessed during religious ceremonies.  (Foundation 56.1 Stmt. ¶ 17; Pls.' Opp'n 3-6.) In September 2006, after communication between the church and the Port Authority, the cross was moved to Saint Peter's Church in lower Manhattan.[3]  (Port Authority 56.1 Stmt. ¶ 13; Kagin Decl., Ex. 6; Pls.' Opp'n 3-4.)  It remained there until 2011 when the Port Authority donated the artifact and transferred its legal title to the Foundation.[4]  (Port Authority 56.1 Stmt. ¶ 13.) In

---

[3] Other artifacts that plan to be displayed at the Museum were housed in a Port Authority hangar.  (Pls.' Opp'n 6.)

[4] The Port Authority donated 227 other artifacts to the Foundation.  In re Sept. 11 Prop. Damage & Bus. Loss Litig., No. 1:21-mc-00101-AKH, dkt. 846.

2011, when it was moved from Saint Peter's Church to the WTC
Site, a short ceremony, which included a simple prayer, occurred.
(Kagin Decl., Ex. 7.)

After the World Trade Center Site ("WTC Site") was listed on
the National Register of Historic Places, the Lower Manhattan
Development Corporation ("LMDC"), which was created by New York
Governor Pataki and New York City Mayor Giuliani, planned and
conducted historic reviews of the WTC Site.  (Port Authority 56.1
Stmt. ¶¶ 8-10.) Because of the WTC Site's historic status, the
Port Authority needed to enter into various stipulations and to
hold public hearings to ensure that, when it constructed the
World Trade Center Transportation Hub, it had considered the
impact on historic properties, including the cross.  (Id. ¶ 11.)

On July 6, 2006, the Port Authority, the Foundation, the
LMDC, and New York City entered into an agreement whereby the
Foundation would assume responsibility for the operations of the
Memorial and Museum.  (Id. ¶ 14.) The Port Authority agreed to
construct the Memorial and Museum and to fund some of the
infrastructure.  (Port Authority 56.1 Stmt. ¶ 15.) The Port
Authority would allow the Foundation to use its property for the
Memorial and Museum.[5]  (Lee Decl., Ex. I, at 1-2.)

---

[5] The Foundation was provided "with an appropriate real
property interest . . . that will take the form either of a fee
or a ground-lease equivalent."  (Lee Decl., Ex. I, at 1-2.)

5

The Foundation has received significant financial support from the federal and New York state governments. (Pls.' Opp'n 9, 13.) Additionally, on August 6, 2010, President Obama signed into law the National September 11 Memorial and Museum Commemorative Medal Act of 2010, which creates a National Medal to commemorate the tenth anniversary of the September 11 attacks and "the establishment of the National September 11 Memorial & Museum at the World Trade Center." Pub. L. No. 111-221, § 2(a). The Act added a $10 surcharge per Medal to be paid to the National September 11 Memorial and Museum at the World Trade Center.[6] Id. § 7(a)-(b). In 2006, the New York State Assembly passed a bill that would prohibit charging admission to the Memorial or Museum, which was vetoed by Governor Pataki. Assem., 2006, A12032, (N.Y. 2006), vetoed Sept. 13, 2006.[7]

C. The Memorial and the Museum

Located outdoors on the former site of the World Trade Center, the Memorial commemorates the victims of the September 11, 2001 attacks and the 1993 World Trade Center bombings.

_____

[6] The Act does not refer to the Memorial and Museum as an incorporated entity.

[7] Additionally, H.R. 2865 was introduced in the United States House of Representatives, which if passed would have authorized the Secretary of the Interior to provide technical and financial assistance to, among other authorizations, preserve and support the cross. H.R. 2865, 112th Cong. (2011).

(Foundation 56.1 Stmt. ¶ 4.) The cross has never been displayed at the Memorial, and there are no plans to display it there. (Id. ¶ 5.)

Currently unopened, the Museum will be located primarily underground, beneath the Memorial.  (Id. ¶¶ 6, 10.) The Museum's mission is to document the history of the 1993 and 2001 events by including physical artifacts to tell its story.  (Id. ¶¶ 8-9.) The Museum will have three separate exhibits: an Introductory Exhibition, a Memorial Exhibition, and a Historical Exhibition. (Id. ¶ 11.) To help demonstrate and document history, the Foundation plans to have approximately 1,000 objects on display, including physical artifacts, photographs, oral histories, video presentations, the cross, a fire truck, an ambulance, large beams from the debris, part of the World Trade Center's facade, and the last column ("Last Column") that was removed from Ground Zero. (Id. ¶ 10.)

The Historical Exhibition will tell the narrative of the September 11 attacks and the 1993 World Trade Center bombing by incorporating over 800 artifacts.  (Id. ¶ 13.) Within the Historical Exhibition will be a section entitled "Finding Meaning at Ground Zero," which will portray how those at Ground Zero struggled to cope with the horrific situation they faced.  (Id. ¶ 14.) To cope, some turned to religion, patriotism, or forging relationships with relatives of victims.  (Id. ¶ 15.) In this

7

section, the Foundation plans to include the cross.[8]  (Id. ¶ 16.)

Surrounding the artifact, the Foundation plans to have text panels explaining its historical significance to the recovery effort.[9]  (Id. ¶ 20.) Other objects of historical significance will also be in the section, including several pieces of "symbol steel," which is steel that ironworkers at Ground Zero cut into religious and non-religious symbols, such as a Star of David, a Maltese cross, the Twin Towers, and the Manhattan skyline.  (Id. ¶ 21; Paterson Decl., Ex. 4.)

On September 10, 2012, after the close of discovery, the Port and the Foundation entered into a Memorandum of Understanding to "clarify . . . their financial and operating relationship."  (Kagin Decl., Ex. 5; Port and Foundation Memorandum of Understanding, at 1.) The New York and New Jersey Governors will designate people to serve on the Foundation's Finance and Investment Committee.  (Id. at 2.) The Foundation and Port Authority will have quarterly meetings to review the Foundation's financial status, and they will have annual planning and budget meetings.  (Id. at 2.) They also "agree to work

---

[8] Although not material, it is worth noting that Plaintiffs assert the cross would be the largest object in the museum; however, the Last Column is thirty-seven feet tall, a fact deemed admitted.  (Pls.' Opp'n 4; Foundation 56.1 Stmt. ¶ 10.)

[9] Plaintiffs "admit that the [c]ross is an artifact of historic significance."  (Pls.' Opp'n 10.)

together to obtain federal funding to subsidize the Memorial and Museum's costs of operations." (Id. at 2.) Additionally, the Memorandum of Understanding established a Site-wide Coordination Task Force to address the planning and implementation of activities at the WTC Site and a Major Event Planning Working Group; both will have representatives from the Port, the Foundation, and the City of New York. (Id. at 3-4.) The New York and New Jersey Governors will have a role in selecting some of the two groups' representatives. (Id. at 3-4.)

## II.  DISCUSSION

### A.  Legal Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2008). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. Melendez v. Mitchell, 394 Fed. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the

9

plaintiff." <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d
Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 252 (1986)).  The non-movant may not rely upon speculation
or conjecture to overcome a motion for summary judgment.  <u>Burgess
v. Fairport Cent. Sch. Dist.</u>, 371 Fed. App'x 140, 141 (2d Cir.
2010).  Instead, when the moving party has documented particular
facts in the record, "the opposing part must come forward with
specific evidence demonstrating the existence of a genuine
dispute of material fact." <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d
288, 292 (2d Cir. 2010) (citing <u>Anderson</u>, 477 U.S. at 249).
Genuine issues of material fact cannot be created by merely
conclusory allegations or unsubstantiated speculation.  <u>Victor v.
Milicevic</u>, 361 Fed. App'x 212, 214 (2d Cir. 2010); <u>Melendez</u>, 394
Fed. App'x at 740.  Thus, unsupported allegations in the
pleadings cannot create a material issue of fact.  <u>Weinstock v.
Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000).


     B.   State Action

Defendants argue that Plaintiffs' Establishment Clause,
Equal Protection Clause, New York constitution, and New Jersey
constitution claims fail because the Foundation's decision to
display the cross is not a state action.  (Foundation's Mot.
Summ. J. 18; Port Authority's Mot. Summ. J. 5, 10-11.) The Port
Authority, Defendants assert, had no role in the display of the

10

cross because the Foundation is solely responsible for the
Museum's Exhibits.  (Foundation's Mot. Summ. J. 7; Port
Authority's Mot. Summ. J. 5.)

> 1.    Legal Standard for a State Action

Private conduct need not conform to the First Amendment
unless "the challenged action of a private party is fairly
attributable to the state."  <u>Hollander v. Copacabana Nightclub</u>,
624 F.3d 30, 33 (2d Cir. 2010) (internal quotation marks
omitted).  A private entity's actions may be attributable to the
state if

> (1) the entity acts pursuant to the "coercive power" of
> the state or is "controlled" by the state ("the
> compulsion test"); (2) when the state provides
> "significant encouragement" to the entity, the entity
> is a "willful participant in joint activity with the
> [s]tate," or the entity's functions are "entwined" with
> state policies ("the joint action test" or "close nexus
> test"); or (3) when the entity "has been delegated a
> public function by the [s]tate," ("the public function
> test").

<u>Sybalski v. Indep. Grp. Home Living Program, Inc.</u>, 546 F.3d 255,
257 (2d Cir. 2008) (quoting <u>Brentwood Acad. v. Tenn. Secondary</u>
<u>Sch. Athletic Ass'n</u>, 531 U.S. 288, 296 (2001)).

For the close nexus test to apply, "there is such a 'close
nexus between the State and the challenged action' that seemingly
private behavior 'may be fairly treated as that of the State

itself.'"[10]   __Brentwood Acad.__, 531 U.S. 288, 296 (2001) (quoting

__Jackson v. Metropolitan Edison Co.__, 419 U.S. 345, 351 (1974));

__Cooper v. U.S. Postal Serv.__, 577 F.3d 479, 491 (2d Cir. 2009).

"What is fairly attributable [as state action] is a matter of

normative judgment, and the criteria lack rigid simplicity."

__Brentwood Acad.__, 531 U.S. at 295 (explaining the analysis is a

"necessarily fact-bound inquiry").  One requirement, however, is

that there be a close nexus so that "it can be said that the

State is responsible for the specific conduct of which the

plaintiff complains."  Blum v. Yaretsky, 457 U.S. 991, 1004

(1982); Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 111

(2d Cir. 2003).  This is met when a plaintiff "allege[s] that the

state was involved with the activity that caused the injury

giving rise to the action."  Sybalski, 546 F.3d at 257-58

(citation and quotation omitted); Hollander, 624 F.3d at 34.

When a state is not involved directly in "the events at

issue," a corporation's actions may nonetheless be attributable

---

[10] Plaintiffs do not allege, nor is there any indication
that, coercion is applicable here.  See __Brentwood Acad.__, 531 U.S.
at 295.  Although Plaintiffs allege commemorating the dead is a
public function, that is not the case.  See __Gay Veterans Ass'n,
Inc. v. Am. Legion-New York Cnty. Org.__, 621 F. Supp. 1510, 1517-
18 (D.C.N.Y. 1985) (holding that sponsoring Veterans Day parades
was not an "exclusive" public function).  No other allegations
have been made that the Foundation is performing a public
function, nor does the Court find the public function exception
applicable.  Accordingly, the only test applicable here is the
close nexus test.

to the state "if 'the relevant facts show pervasive entwinement
to the point of largely overlapping identity' between the State
and the entity."  Horvath v. Westport Library Ass'n, 362 F.3d
147, 154 (2d Cir. 2004) (quoting Brentwood Acad., 531 U.S. at
303); Lown v. Salvation Army, Inc., 393 F. Supp. 2d 223, 244
(S.D.N.Y. 2005) ("In certain circumstances, a private
organization may be so entwined with government that its conduct
may be deemed per se state action.").

### 2. Whether Including the Cross in the Museum Can Be Deemed a State Action

Defendants argue that the receipt of government funds and
the use of government land does establish state action because
Plaintiffs make no showing that the state was involved with the
activity that caused the injury.  (Foundation's Mot. Summ. J. 8-
9; Port Authority's Mot. Summ. J. 5.) Although Defendants
correctly state the law, they incorrectly claim the use of
government funds and land was the only involvement the Foundation
had with the state.  As will be explained below, the Foundation
had significant involvement with the state and the Port
Authority.

The Port Authority had a direct role in the complained-of
activity; it donated the artifact to the Foundation for the
purpose of it being displayed in the Museum.  Cf. Colabella v.

Am. Institute of Certified Public Accountants, No. 10 Civ. 2291, 2011 WL 4532132, at *11 (E.D.N.Y. Sept. 28, 2011) (holding no state action "because the state had no role in the complained-of activity, the discharge and transfer of patients without a hearing" where the state merely granted the organization tax-exempt status); cf. Petrusa v. Suffolk Cnty. Soc. for Prevention of Cruelty to Animals, No. 05 Civ. 6017, 2009 WL 1796996, at *5-6 (E.D.N.Y. June 24, 2009) (holding no state action because there was no connection between granting the authority to provide animal control services and a private employer's employment decisions and practices); cf. Kabbani v. Council House, Inc., 1193-95 (W.D. Wash. 2005) (holding no state action because, despite there being state regulation and government funding, "the government [was] not involved in the day to day operations of [the entity] . . . and played no role in the eviction decision). Although the Foundation had the ultimate authority in choosing what to display in the Museum, the Port Authority provided "critical assistance" in the Foundation's ability to include the cross in the Museum: it donated the artifact, granted the Foundation a property interest at the WTC Site to establish the Museum, will construct the Museum, and has an ongoing relationship in the operation of the Museum and Memorial, as evidenced in the Memorandum of Understanding.  Rundus v. City of

14

<u>Dallas</u>, 634 F.3d 309, 312-15 (5th Cir. 2011) (holding there was a state action because the city had a role in "planning, advertising, [and] managing the festival"); <u>Wickersham v. City of Columbia</u>, 481 F.3d 591, 598 (8th Cir. 2007) (holding an air show run by a nonporfit organization and held at a city's airport was a state action because "the city not only provided critical assistance in planning and operating the show, but also played an active role in enforcing the particular speech restrictions").

   The Foundation argues that the mere receipt of government funds and use of government lands do not establish state action. (Foundation's Mot. Summ. J. 8.) If that was truly the only relationship between the Foundation and the government, there would be no state action.[11]  <u>See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.</u>, 483 U.S. 522, 544-46 (1987) (holding no state action because Congress granting the organization's corporate charter and its exclusive use of the word "Olympic" does not make the enforcement of the use of "Olympic" a government action); <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 841

_____

   [11] Likewise, the Port Authority's argument that it cannot violate the Establishment Clause merely by allowing the Foundation to use its property misstates the relationship between the Foundation and the Port Authority.  Leasing property does not constitute a state action, but Defendants are more interrelated than simply being a lessor-lessee.  <u>See</u> <u>Brashich v. Port Auth. of New York & New Jersey</u>, 791 F.2d 224, 226 (2d Cir. 1980); <u>see also</u> <u>Fisher v. Silverstein</u>, No. 99 Civ. 9657, 2004 WL 1933610 (S.D.N.Y. Aug. 30, 2004).

(holding the receipt of funding does not render the school a state action because "the relationship between the school and its teachers" did not change because of the state's funding and personnel decisions were uninfluenced by the state); Szekeres v.Schaeffer, 304 F. Supp. 2d 296, 307-08 (D. Conn. 2004) (holding the receipt of state funds, without additional facts of governmental control, does not constitute a state action).  That is not the case.  Here, the governmental actions go far beyond distributing funds or granting land use where the entity could use the funds as it sees fit: the Port Authority gave the cross to the Foundation for the sole purpose of it being displayed in the Museum.  Cf. Cranley, 318 F.3d at 112-13 (holding no state action when a plan "was voluntarily conceived, approved, and executed by the management and membership of a private company").

Similarly, Defendants claim the Port Authority was not involved in the activity that allegedly violated the Establishment Clause because it played no role in the decision to display the artifact or other exhibit items.  As explained above, although the Port Authority made no decision in how the cross would be displayed, it certainly played a role in the decision to display the cross at the Museum.  Cf. Sybalski, 546 F.3d at 258-59 (holding there was no state action when a health care facility decided to limit a patient's visitors when the state only

16

"established underlined{procedures} governing the limitations that mental
health facilities place on the ability of patients to receive
visitors, the administrators of those facilities [made] the
<u>decision</u> about whether such limitations should be imposed"); cf.
Schlein v. Milford Hosp., Inc., 561 F.2d 427, 428-29 (2d Cir.
1977) (holding there was no state action when a hospital, which
was a non-profit corporation regulated by the state, did not
grant a physician staff privileges when the state had no
regulations or control regarding such procedures).

But for the Port Authority's donation of the cross, but for
the Port Authority granting the Foundation a property interest at
the WTC Site, but for the Port Authority's aid in constructing
the Museum, and but for their continuing financial and operating
relationship, the Foundation would not be able to include the
artifact in the Museum.  Accordingly, the Port Authority was
involved in the activity causing Plaintiffs' alleged injury, and
the decision to include the cross in the Museum is a state
action.

In the alternative, the Foundation is a state actor because
of its pervasive entwinement with the state.  State assistance,
including "[u]sing government property, government staff, and
even government funds," is insufficient to establish pervasive
entwinement unless "the decisionmakers were ostensibly state

17

actors."  <u>Abdullahi v. Pfizer, Inc.</u>, 562. F.3d 163, 212 (2d Cir.
2009).  Here, in addition to significant aid given by the Port
Authority, federal, state, and local governments to the
Foundation, the government has played a significant role in the
Foundation's decision-making process.  The Foundation's
composition of its Board of Directors,[12] the Memorandum of
Understanding between the Port Authority and the Foundation, and
the New York State Assembly bill regarding admission fees
demonstrate that significant entwinement of decision-making
between the government and the Foundation.[13]  <u>Brentwood Acad.</u>,
531 U.S. at 299-300 (holding there was pervasive entwinement were
the athletic association was controlled by public officials and

_____

[12] Although the New York and New Jersey governors now only
appoint two, out of a minimum of fifteen, Directors, for two
years the governors appointed all the Directors.

[13] Moreover, because pervasive entwinement "revolves around
the relationship between the state and the actor," the
relationship between the state and the Foundation makes it so the
Foundation's actions may be considered the actions of the state.
<u>Abdullahi</u>, 562 F.3d at 212.  Although the Foundation is a
corporate entity, its name——National September 11 Memorial and
Museum at the World Trade Center Memorial Foundation, Inc.——and
the fact it manages the Museum and Memorial precisely where the
September 11 attacks occurred, helps demonstrate an "overlapping
identity."  <u>Id.</u> at 212 (quoting <u>Horvath</u>, 362 F.3d at 154).  This
overlapping identity is reinforced because Congress, in the
National September 11 Memorial and Museum Commemorative Medal Act
of 2010, refers to the Memorial and Museum not as an incorporated
entity but as the "National September 11 Memorial and Museum at
the World Trade Center."  Further, the most analogous site, the
USS Arizona Memorial at Pearl Harbor, is managed by the National
Park Service.

18

its staff was eligible for some public benefits); <u>Horvath</u>, 362
F.3d at 154 (holding there was pervasive entwinement because the
library received "pervasive public funding" and the town
controlled "one-half of its governing board").


    C.    The First Amendment Claim

    Plaintiffs claim the prominent display of the cross violates
the Establishment Clause because it constitutes an endorsement of
Christianity, especially since it diminishes non-Christian
rescuers. (Pls.' Opp'n 19-20.) Defendants assert that including
the artifact in the Museum is permissible under the <u>Lemon</u> test.[14]
(Foundation's Mot. Summ. J. 10-15; Port Authority's Mot. Summ. J.
4-8.)


    1.    Legal Standard of an Establishment Clause Claim

    When considering the Establishment Clause, "neutrality is
the 'touchstone' of First Amendment analysis." <u>Skoros v. City of
New York</u>, 437 F.3d 1, 16 (2d Cir. 2006) (quoting <u>McCreary Cnty.
v. Am. Civil Liberties Union</u>, 545 U.S. 844, 860 (2005)). This

---

[14] Defendants also assert that the cross is government speech
and thereby does not violate the First Amendment. Although
"government speech is not restricted by the Free Speech Clause"
of the First Amendment, "government speech must comport with the
Establishment Clause." <u>Pleasant Grove City v. Summum</u>, 555 U.S.
460, 469, 468 (2009).

"general principal" of neutrality, however, does not require
"absolute neutrality."  Id. at 16-17.  The Supreme Court has
articulated the three-part Lemon test for evaluating challenges
under the Establishment Clause when a government action interacts
with religion: the action "(1) 'must have a secular . . .
purpose,' (2) must have a 'principal or primary effect . . . that
neither advances nor inhibits religion,' and (3) 'must not foster
an excessive government entanglement with religion.'"[15]  Bronx
Household of Faith v. Bd. of Educ. of City of New York, 650 F.3d
30, 40 (2d Cir. 2011) (quoting Lemon v. Kurtzman, 403 U.S. 602,
612-13 (1971)); Skoros, 437 F.3d at 17.

The first prong requires that "when the government interacts
with religion, [the] purpose must be 'secular.'"  Skoros, 437
F.3d at 18 (quoting Lemon, 403 U.S. at 612).  Courts "generally
accord 'deference' to . . . a clear government statement of an
actual secular purpose provided that the reason is 'genuine, not
a sham, and not merely secondary to a religious objective.'"
Skoros, 437 F.3d at 19-20 (quoting McCreary, 545 U.S. at 863).

The second prong "prohibits government from appearing to
take a position on questions of religious belief or from 'making

---

[15] Despite being "much criticized," the Lemon test "continues
to govern the analysis of Establishment Clause claims in [the
Second] Circuit."  Bronx Household, 650 F.3d at 40 n.9; Skoros,
437 F.3d at 17 n.13.

adherence to a religion relevant in any way to a person's standing in the political community.'"  County of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 594 (1989) (quoting Lynch v. Donnelly, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring); Bronx Household, 650 F.3d at 41.  Accordingly, this prong "asks whether 'the practice under review in fact conveys a message of endorsement or disapproval.'"  Skoros, 437 F.3d at 17 (quoting Lynch, 465 U.S. at 690 (O'Connor, J., concurring)).

Although violations of the effect prong can result from the perception or appearance of endorsement, "the constitutionality of its effect must also be judged according to the standard of a reasonable observer."  Allegheny, 492 U.S. at 620 (citation and quotation omitted); Salazar v. Buono, 559 U.S. 700, 130 S.Ct. 1803, 1819-20 (2010).  A reasonable observer is aware of "the history and context of the forum" when determining whether "the display had the effect of favoring or disfavoring a certain religion."  O'Connor v. Washburn Univ., 416 F.3d 1216, 1227-28 (10th Cir. 2005) (citing Bauchman for Bauchman v. West High Sch., 132 F.3d 542, 551-51 (10th Cir. 1997)); Galloway v. Town of Greece, 681 F.3d 20, 31 (2d Cir. 2012) (explaining the reasonable observer views a practice "in its totality" to determine if it "conveyed the view that the town favored or disfavored certain religious beliefs"); Skoros, 437 F.3d at 22 (explaining the

reasonable observer takes into "full account . . . the policy's text, history, and implementation").

The entanglement prong is part of a court's inquiry into the governmental action's effect.  Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 425 (2d Cir. 2002) (quoting Agostini v. Felton, 521 U.S. 203, 233 (1997)).  Because entanglement between church and state "becomes constitutionally 'excessive' only when it has 'the effect of advancing or inhibiting religion,'" the third prong is "properly treated as 'an aspect'" of the second.  Skoros, 437 F.3d at 36 (quoting Agostini, 521 U.S. at 233).  A court, therefore, considers "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority."  Agostini, 521 U.S. at 232 (quoting Lemon, 403 U.S. at 615).

2.  The Lemon Test As Applied to the Museum's Cross

a.  Purpose Prong

Plaintiffs concede that including the cross as part of the Historical Exhibition has a secular purpose.  (Pls.' Opp'n 9-10.)  By incorporating the artifact in the section, "Finding Meaning at Ground Zero," part of the September 11 historical narrative is

told more fully, as the cross and its accompanying textual panels

helps demonstrate how those at Ground Zero coped with the

devastation they witnessed during the rescue and recovery effort.

The cross, therefore, meets the first prong because its actual

purpose is historical and secular.  See Skoros, 437 F.3d at 19

(holding the "stated purpose" of holiday displays at school was

secular); O'Connor, 416 F.3d at 1225-26 (holding the display of

an allegedly anti-Catholic statute had a secular purpose in

enhancing the university's educational experience and its

campus's beautification because there was no "religiously

motivated reason" for its display).


### b.    Endorsement Prong


With the second prong, Defendants claim that since the

artifact is displayed in a museum setting, no endorsement of

religion occurs.  (Port Authority's Mot. Summ. J. 7, 12-13;

Foundation's Mot. Summ. J. 15.) Courts repeatedly have recognized

that including a religious artifact in a museum will often times

negate any endorsement.  See Allegheny, 492 U.S. at 595

(O'Connor, J., concurring in part and concurring in the judgment)

("[A] typical museum setting, though not neutralizing the

religious content of a religious painting, negates any message of

endorsement of that content."); <u>Lynch</u>, 465 U.S. at 683

(explaining a display of a crèche was "no more an advancement or

endorsement of religion than . . . the exhibition of literally

hundreds of religious paintings in governmentally supported

museum"); <u>O'Connor</u>, 416 F.3d at 1228 (discussing art in a museum

setting); <u>Brooklyn Inst. of Arts & Sci. v. City of New York</u>, 64

F. Supp. 2d 184, 201 (E.D.N.Y. 1999) (holding a museum displaying

a work "which is viewed by some as sacrilegious" is no more

"endorsement of anti-religious views" than showing "religiously

reverential works constitutes an endorsement"); <u>Crowley v.</u>

<u>Smithsonian Inst.</u>, 462 F. Supp. 725 (D.C.D.C. 1978) (holding

evolution exhibits did not advance a religious theory).

Accordingly, since the cross is housed in the Museum, its

inclusion——in the September 11 Museum context with placards to

explain why it was included in the Historical Exhibit——does not

advance or endorse religion.[16]

---

[16] Plaintiffs attempt to distinguish the instant Museum from
other museums by claiming that the purpose of religious displays
in encyclopedic and art museums is to "display . . . many
religious objects from different cultures together to maximize
their educational value." (Pls.' Opp'n 2, 17; Kreder Expert
Report, at ¶ 3.) Plaintiffs argue that since the Museum is a
memorial museum, the cross's inclusion signifies endorsement.
(Pls.' Opp'n 2, 17.) This attempt to distinguish types of museums
is unsupported by any case law.  Moreover, simply because a
museum was created in part to commemorate a tragedy or an event
does not make it less of a museum.  Numerous museums, such as the
National World War Two Museum and the United States Holocaust
Memorial Museum, have both historical and memorial components yet

Plaintiffs assert that because the cross was used during Christian religious ceremonies, it is unlike historic religious objects that are housed in museums.  (Pls.' Opp'n 20-21.) They, however, cite to no case law making such a distinction.  Rather, the fact that the artifact is housed in the Historical Exhibit helps to negate any "sacred message" even though it "undeniably has a religious message." Van Orden v. Perry, 545 U.S. 677, 702 (2005) (Breyer, J., concurring in the judgment); Okrand v. City of Los Angeles, 207 Cal. App. 3d 566, 580 (1989) (holding that the unlit Katowitz Menorah displayed at city hall did not violate the Establishment Clause in part because "its unique historical background [made it] much more a museum piece than a symbol of religious worship").  Also helping to negate any potential endorsement is the fact that explanatory placards will accompany the artifact.  See Joki v. Board of Education of Schuylerville Cent. School Dist., 745 F. Supp. 823, 831 (N.D.N.Y. 1990). Moreover, the acknowledgment that many rescuers and volunteers found solstice in the cross is not endorsement of their religion. See Books v. Elkhart County, 401 F.3d 857, 868 (7th Cir. 2005). Since "[t]he Establishment Clause is not violated when the government teaches about the historical role of religion," id.,

---

are still museums.

simply because people did in fact worship in front of the cross does not make its display an endorsement of Christianity.

Plaintiffs also argue that because the artifact is seventeen feet tall, its size signals endorsement because no other artifact will be as large as the cross.[17]  (Pls.' Opp'n 21-22.) Simply because the cross is large does not inherently mean there is endorsement.  Elewski v. City of Syracuse, 123 F.3d 51 (2d Cir. 1997) (holding a large crèche was not an endorsement of religion because there were other secular displays); Joki, 745 F. Supp. at 829-32 (holding a painting endorsed religion when it was housed in a high school but not on grounds of its size though other objects were "dwarfed" by comparison).  Although the size of the item may be a factor in determining whether government endorsement exists, here, the cross is seventeen feet tall because that was the artifact's size when it was found. Defendants did not create the cross to be such an imposing figure in the Museum, see, e.g., Trunk v. City of San Diego, 629 F.3d 1099, 1118 (9th Cir. 2011), but rather, one of the reasons that rescuers found meaning was because of its size when discovered amidst the destruction.  Accordingly, its size does not equate endorsement.

---

[17] Plaintiffs are mistaken: the cross will not be the largest artifact in the Museum.  See infra; Foundation 56.1 Stmt. ¶ 10.)

Moreover, there will be numerous secular artifacts around the cross, as well symbol steel with depictions of a Star of David, a Maltese cross, the Twin Towers, and the Manhattan skyline, which will reinforce to the reasonable observer that they are perceiving a historical depiction of some people's reaction to finding the cross at Ground Zero.[18]  See Elewski, 123 F.3d at 55 (holding that a crèche in the context of other traditional religious and secular symbols would cause an observer to "perceive a celebration of the diversity of the holiday season").  Simply because one object, which is one component of a secular exhibition, is religious does not engender endorsement. See Van Orden, 545 U.S. at 702 (Breyer, J., concurring in the judgment) (concluding a Ten Commandments monument did not have a religious context when it was in a large park with thirty-eight other objects illustrating the ideals of those who settled in Texas); O'Connor, 416 F.3d at 1228-29 (holding one allegedly anti-Catholic sculpture among an exhibit of thirty outdoor statutes was not an endorsement).

"A reasonable observer is not one who wears blinders and is frozen in a position focusing solely on the" religious object.

---

[18] While Plaintiffs complain that no atheist symbol will be included in the Museum (Pls.' Opp'n 9-10), they have failed to suggest a generally recognized symbol of atheism to incorporate in the Historical Exhibition.  (See Kagin Decl., Ex. 3.)

27

_Elewski_, 123 F.3d at 54.  Because a reasonable observer would be
aware of the history and context of the cross and the
Museum——especially given that the cross will be housed in the
"Finding Meaning at Ground Zero" section, accompanied by placards
explaining its meaning and the reason for its inclusion, and
surrounded by secular artifacts——no reasonable observer would
view the artifact as endorsing Christianity.

c.   Entanglement Prong

Besides the arguments mentioned in the endorsement-prong
analysis, the only additional allegation Plaintiffs make in
arguing impermissible entanglement is an email from the
Foundation's Chief of Staff to Father Jordan regarding moving the
cross from Saint Peter's Church, returning it to the WTC Site,
and having a short program and prayer.  (Kagin Decl., Ex. 7.)
Plaintiffs make no allegations that any church officials ever had
any decision-making authority in whether to house the cross in
the Museum or how the Foundation would display the artifact.

There is no excessive entanglement here.  By displaying the
artifact, the Museum——not a church or religious entity——is
benefitted.  See _Agostini_, 521 U.S. at 232.  The Port Authority
and Foundation provide no aid to any religious entity.  See _id._
Although the cross was housed temporarily in a church, that does

28

not provide excessive entanglement with respect to the decision to include the artifact in the Museum.  In essence, there is no relationship between Defendants and religious authorities with respect to deciding to include the artifact at the Museum or how to display it.  Agostini, 521 U.S. at 234-35 (holding a government funded program providing remedial instruction by government employees at a sectarian school was not impermissible entanglement); Lynch, 465 U.S. at 684 ("There is no evidence of contact with church authorities concerning the content or design of the exhibit prior to or since [the city's] purchase of the crèche.").  Moreover, the cross is going to be displayed as a subject of history thereby negating entanglement.  See Crowley, 462 F. Supp. at 727 ("The Museum deals with evolution, appropriately, as a subject of natural history and not, either explicitly or implicitly, as a religious matter.")

Since the decision to include the artifact in the Museum's Historical Exhibit has a secular purpose, Defendents have not advanced religion impermissibly, and the cross does not create excessive entanglement between the state and religion.  Thus, Plaintiffs' Establishment Clause claim fails.

29

C.   The Equal Protection Claim

Plaintiffs claim that including the artifact in the Museum violates the Equal Protection Clause of the Fourteenth Amendment because the cross "promotes Christianity over all other religions."  (Am. Compl. ¶ 51.) Namely, they argue that not including an atheist symbol trivializes the mourning of non-Christians. (Pls.' Opp'n 23.)

"The Equal Protection Clause prohibits the government from subjecting individuals to 'selective treatment . . . based on impermissible considerations such as . . . religion.'"  Lown, 393 F. Supp. 2d at 235 (quoting Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156, 166 (2d Cir. 2001).  "To prove an equal protection violation, claimants must prove purposeful" or intentional "discrimination by a government actor directed at a suspect class, such as" a religious group.  Congregation Rabbinical Coll. of Tartikov, Inc., -- F. Supp. 2d --, No. 07 Civ. 6304, 2013 WL 66472, at *29 (S.D.N.Y. Jan. 4, 2013) (internal citations and quotations omitted); Knight, 275 F.3d at 166; Thomas v. City of New York, 143 F.3d 31, 37 (2d Cir. 1998).  This intentional discrimination may be demonstrated in one of three ways:

by pointing to [1] a law that expressly classifies on the basis of race, [2] a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or [3] a facially neutral policy that has an

30

adverse effect and that was motivated by discriminatory animus.

<u>Pyke v. Cuomo,</u> 567 F.3d 74, 76 (2d Cir. 2009) (quotation omitted).

If claimants can demonstrate such intentional discrimination on the basis of religion, the government action is "subject to strict judicial scrutiny."  <u>Pyke</u>, 567 F.3d at 77; <u>Bronx Household</u>, 876 F. Supp. 2d at 425-26.  Absent evidence of intentional discrimination, the government action is subject to rational basis review.  <u>See</u> <u>Abascal v. Jarkos</u>, 357 Fed. App'x 388, 391 (2d Cir. 2009); <u>Lown</u>, 393 F. Supp. 2d at 237. Rational basis also applies to classifications that do not involve fundamental rights.  <u>Heller v. Doe by Doe</u>, 509 U.S. 312, 319-20 (1993) ("A classification must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."); <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos</u>, 483 U.S. 327, 339 (1987) (applying rational basis to "a statute [that] is neutral on its face . . . and passes the Lemon test"); <u>Red Earth LLC v. United States</u>, 657 F.3d 138, 147 (2d Cir. 2011). And, absent allegations of "'adverse treatment of individuals compared with other similarly situated individuals' based on religion," an Equal Protection claim fails.  <u>Incantalupo v. Lawrence Union Free Sch.</u>

<u>Dist.</u>, 380 Fed. App'x 59, 62 (2d Cir. 2010) (quoting <u>Miner v.</u>
<u>Clinton County</u>, 541 F.3d 464, 474 (2d Cir. 2008)).

Here, Plaintiffs fail to allege any form of intentional
discrimination, any animus in Defendants inclusion of the cross,
or any adverse or unequal treatment on the basis of their
religious beliefs.[19]  Their Equal Protection claim thereby fails.
<u>See</u> <u>Lown</u>, 393 F. Supp. 2d at 236.  Deciding to include a
religious symbol in a museum does not subject individuals to
disparate treatment on the basis of religion.  Moreover, even if
it were a form of adverse treatment, Plaintiffs make no
allegations of intentional discrimination and their Establishment
Clause claim failed; any adverse treatment therefore would be
subject to rational basis review.  Rational basis is easily met.
The Museum's purpose is to tell the history surrounding September

---

[19] Plaintiffs' only assertion of unequal treatment is that
the Foundation refuses to include a symbol that represents
atheists who helped in the rescue and relief effort.  (Pls.'
Opp'n 23.) That decision is government speech and not subject to
a challenge under the Equal Protection Clause.  <u>See</u> <u>Pleasant</u>
<u>Grove</u>, 555 U.S. at 481 (holding a city's "decision to accept
certain privately donated monuments while rejecting respondent's
is best viewed as a form of government speech"); <u>Children First</u>
<u>Found., Inc. v. Martinez</u>, 169 Fed. App'x 637, 639 (2d Cir. 2006).
Since their speech comported with the Establishment Clause,
Defendants have the "freedom to express [their] views when [they]
receive assistance from private sources for the purpose of
delivering a government-controlled message."  <u>Pleasant Grove</u>, 555
U.S. at 468.

11, and the cross, as explained above, helps tell part of that history.

    D.   New York State Law Claims

        1.   New York Constitution Claims

            a.   New York's Freedom of Worship and Religious Liberty Section

Plaintiffs allege the cross violates Article One, Section Three of the New York constitution.  (Am. Compl. ¶ 55.) New York courts have applied the <u>Lemon</u> test in analyzing claims under this Section of the New York constitution.  <u>See, e.g.</u>, <u>In re Faith Bible Church</u>, 582 N.Y.S.2d 841, 843 (N.Y. App. Div. 1992); <u>Grumet v. New York State Educ. Dep't</u>, 579 N.Y.S.2d 1004, 1007 (N.Y. Sup. Ct. 1992); <u>Orzechowski v. Perales</u>, 582 N.Y.S.2d 341, 347-48 (N.Y. Sup. Ct. 1992).  Since Plaintiffs' Establishment Clause claim fails under the <u>Lemon</u> test, so too does their New York constitution claim.

            b.   New York's Equal Protection Section

Plaintiffs also claim a violation of Article One, Section Eleven of the New York constitution.  (Am. Compl. ¶ 56.) New York courts apply the same analysis for Equal Protection challenges

under the New York constitution as under the Federal

Constitution.  See, e.g., Under 21 v. City of New York, 65 N.Y.2d

344, 360 n.6 (N.Y. 1985) ("We have held that the State

constitutional equal protection clause . . . is no broader in

coverage than the Federal provision."); In re Faith Bible Church,

582 N.Y.S.2d at 844.  Plaintiffs' New York Equal Protection claim

therefore fails for the same reasons their federal one does.


### 2.   New York Civil Rights Act Claims

Plaintiffs assert two claims under the New York Civil Rights

Law: violations of Article 4 Section 40 and Article 4 Section 40-

c(2).  These claims fail for several reasons.

As an initial matter, the New York Civil Rights Law does not

apply to the Port Authority because it is a bi-state agency.

Baron v. Port Auth. of N.Y. & N.J., 968 F. Supp. 924, 929-30

(S.D.N.Y. 1997).  Plaintiffs' New York Civil Rights Act claims

against the Port Authority thereby fails.  Additionally, because

American Atheists, Inc. is an organization, it "cannot sustain a

suit under" Section 40 or Section 40-c of the New York Civil

Rights Act.  Jews for Jesus, Inc. v. Jewish Cmty. Relations

Council of N.Y., Inc., 968 F.2d 286, 293 (2d Cir. 1992); Friends

of Falun Gong v. Pacific Cultural Enter., Inc., 288 F. Supp. 2d
273, 286 (E.D.N.Y. 2003).

Before filing a Section 40 or Section 40-c action,
Plaintiffs' needed to serve notice of the action before the New
York Attorney General.  N.Y. Civ. Rights L. §§ 40-d, 411; Feacher
v. Intercontinental Hotels Grp., 563 F. Supp. 2d 389, 407-08
(N.D.N.Y. 2008); Perez Rivera v. Hertz Corp., 990 F. Supp. 234,
238 (S.D.N.Y. 1997) (citing Silver v. Equitable Life Assurance
Soc'y, 563 N.Y.S.2d 78, 80 (N.Y. App. Div. 1990).  Since
Plaintiffs failed to comply, summary judgment is therefore proper
with respect to their Section 40 and Section 40-c claims.
Feacher, 563 F. Supp. 2d at 407-08  Perez Rivera, 990 F. Supp. at
238; Harvey v. NYRAC, Inc., 813 F. Supp. 206, 212 (E.D.N.Y.
1993).

Even if Plaintiffs complied with the notice requirement,
their New York Civil Rights Act claims would not succeed.
Plaintiffs Horvitz, Bronstein, and Everhart (the "Individual
Plaintiffs") allege that including the cross in the Museum
violates Article 4 Section 40, which guarantees equal rights in
public accommodations, including educational facilities, and
prohibits the denial of access to public accommodations on the
basis of race, creed, color, or national origin.  (Am. Compl. ¶
61.) This Section, however, "is a 'public accommodations' statute

which is essentially designed to ensure that the covered

facilities . . . are fully and equally open to all persons

without regard to . . . creed." Weinbaum v. Cuomo, 631 N.Y.S.2d

825, 828 (N.Y. App. Div. 1995). Because the Individual Plaintiffs

never allege they that they are or will be denied equal access to

the Museum because of their beliefs, their claim fails. See id.;

Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y.,

Inc., 79 N.Y.2d 227, 234 (1992).

Article 4 Section 40-c(2) prohibits state entities from

discriminating or harassing people in public places on the basis

of their religious beliefs. N.Y. Civ. Rights L. § 40-c(2).

Since the Individual Plaintiffs "were not denied access to any

place of public accommodation," their Section 40-c(2) claim

fails. Jews for Jesus, 79 N.Y.2d at 234. And, since they do not

allege that they were personally discriminated against" by

Defendants, their claim also fails. Friends of Falun Gong, 288

F. Supp. 2d at 286.


        E.    New Jersey State Law Claims

            1.    New Jersey Constitution Claims

                a.    New Jersey's Establishment Section

        Plaintiffs allege the artifact violates Article One, Section

Four of the New Jersey constitution. (Am. Compl. ¶ 75.) The New

Jersey "Religion Clause is literally less pervasive than the First Amendment," and therefore analysis "of the Religion Clauses will be limited to the federal provisions."  <u>South Jersey Catholic Sch. Teachers Org. v. St. Teresa of the Infant Jesus Church Elementary Sch.</u>, 150 N.J. 575, 586 (1997) (citing <u>Clayton v. Kervick,</u> 56 N.J. 523, 528 (1970)).  Since Plaintiffs' Establishment Clause claim fails, so too does their New Jersey constitution claim.

                    b.   New Jersey's Equal Protection Section

     Plaintiffs allege the cross violates Article One, Section Five of the New Jersey constitution, which is New Jersey's equal protection clause.  (Am. Compl. ¶ 76.)  Although the New Jersey "equal protection analysis may differ somewhat from the federal standard . . . the two approaches are 'substantially the same' and 'will often yield the same result.'"  <u>Brown v. State</u>, 356 N.J. Super. 71, 79 (2002) (quoting <u>Drew Assocs. of N.J., L.P. v. Travisano</u>, 122 N.J. 249, 259 (1991)).  The state equal protection analysis uses "a less rigid balancing approach in which we consider 'the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.'"  <u>McCann v. Clerk of City of Jersey City</u>, 167 N.J. 311, 325 (2001) (quoting <u>Greenberg v. Kimmelman</u>,

99 N.J. 552, 567 (1985)).  Like the federal Equal Protection
Clause, the state constitution "seeks to protect . . . against
the unequal treatment of those who should be treated alike.
Greenberg, 99 N.J. at 568; Roman Check Cashing, Inc. v. New
Jersey Dep't of Banking and Ins., 169 N.J. 105, 117 (2001).

As previously discussed, Plaintiffs do not allege any
unequal treatment or discrimination on the basis of their
religious beliefs.  Since there is no discrimination, their equal
protection claim under the New Jersey constitution does not
withstand summary judgment.[20]


2.   New Jersey Statute 10:1-3 Claim

As an initial matter, the New Jersey's anti-discrimination
statute does not apply to the Port Authority because it is a
bi-state agency.  Baron, 968 F. Supp. at 929-30.  Plaintiffs' New
Jersey Statute claim against the Port Authority thereby fails.

Plaintiffs assert the cross violates New Jersey Statute
10:1-3, which prohibits exclusions from public accommodations

---

[20] Even if their claim did trigger a religious right to have
a symbol of atheism in the Museum (Pls.' Opp'n 23), not including
that symbol would not violate the New Jersey constitution. See
Epstein v. State, 311 N.J. Super. 350, 368 (1998) (holding that
not including Yom Kippur as a legal holiday does not "deny those
adherents the equal protection of laws or effect a discrimination
because of religious principles").

based on religious beliefs.   (Am. Compl. ¶ 81.) "To establish a claim, Plaintiff[s] must prove that the Defendants withheld some privilege or facility from [them] on account of" their religious beliefs.  <u>Varriale v. Borough of Montvale</u>, No. 04-199, 2006 WL 1806411, at *15 (D.N.J. June 29, 2006).  Since Plaintiffs do not allege they will be denied equal access to the Museum on the basis of their beliefs, their claim against the Foundation fails as well.

III. CONCLUSION

    For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED.  The Clerk is directed to enter judgment in favor of Defendants and to close the docket in the matter.
SO ORDERED.
DATED:     March 28, 2013
           New York, New York


Deborah A. Batts
United States District Judge